IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-624

Filed 5 August 2026

Guilford County, No. 21CRS072509-400

STATE OF NORTH CAROLINA

v.

J'MARIUS DESHAW HOWZE

Appeal by Defendant from judgment entered 8 December 2023 by Judge Stephanie L. Reese in Guilford County Superior Court. Heard in the Court of Appeals 8 April 2025.

*Michelle Abbott, for defendant-appellant.*

*Attorney General Jeff Jackson, by Special Deputy Attorney General Michael Bulleri, for the State.*

STADING, Judge.

J'Marius Deshaw Howze ("Defendant") appeals from a jury verdict finding him guilty of first-degree murder, for which he received a sentence of life imprisonment without the possibility of parole. On appeal, Defendant maintains the trial court erred by denying his motion to suppress that asserted an illegal search and seizure. After careful review, we hold the trial court did not err.

## I. Background

This case is about the search and seizure of evidence that was obtained for purposes of an unrelated, earlier criminal investigation. The record tends to show that around 2:00 a.m. on 23 May 2019, law enforcement officers of the High Point Police Department responded to a "shots-fired" call at an apartment complex. Officers Snider and Trew responded to the scene. Upon arrival, Officer Snider began talking to witnesses and Officer Trew observed a parked vehicle with visible exterior bullet holes. Officer Trew approached the vehicle and found Cameron Owens lying back in the driver's seat, unresponsive, with a gun in his right hand. Officer Trew noticed a gunshot wound in Mr. Owens's hip and quickly determined he was deceased. The medical examiner who subsequently performed Mr. Owens's autopsy determined that he died from multiple gunshot wounds.

Upon examination of the scene, law enforcement officers found a HiPoint nine-millimeter carbine rifle located in a wooded area near the apartment complex. Numerous bullet casings were collected from around the vehicle. Ms. Hudson, a crime scene technician with the High Point Police Department, testified to having collected nine-millimeter and .40 caliber casings. She noted the gun found in Mr. Owens's right hand was a .40 caliber. Based on the scene and bullet holes in the vehicle, the responding officers concluded that Mr. Owens drew his weapon in response to someone else firing a weapon. The officers also found two cell phones inside the vehicle: one underneath Mr. Owens's body and one in the backseat. The phone

located underneath Mr. Owens belonged to him and the phone in the back seat belonging to Iyanna Brown.

Officer Moss extracted the contents of Mr. Owens's cell phone. He found a text message conversation between Mr. Owens and an unknown number on the night of his death that stated, "I'm trying to have a threesome. My home girl with me, but you can pull up on me or I can come to you." Mr. Owens was then sent an address and replied, "I can pull up." At 1:34 a.m., Mr. Owens texted that he was ten minutes away. At 1:47 a.m., Mr. Owens received a message saying, "We outside waiting on you in the apartments." The last message in the conversation was a text sent to Mr. Owens at 1:50 a.m. asking for an update on his location.

Detective Buben of the High Point Police Department traced the unknown number and linked it to a "TextMe" account. Detective Buben described "TextMe" as "an application that . . . you can text people for free using WiFi." The account was registered to Justice McLaurin, who was Defendant's girlfriend. Additionally, since the application operates over WiFi, Detective Buben was able to track the origin of the text messages using WiFi signal data. He determined that the signals originated from a home shared by Defendant and Ms. McLaurin.

With the evidence collected, Detective Buben began his investigation into Ms. Brown, the owner of the other phone that was found in Mr. Owens's vehicle. Detective Buben learned that shortly after the shooting, Ms. Brown was arrested for possession of marijuana by the Raleigh Police Department and her boyfriend checked into a

hospital in Raleigh for treatment of a gunshot wound to his hand. Another individual, Carrie Graves, was also a person of interest in Detective Buben's investigation. At some point, Ms. Graves was at the hospital with Ms. Brown and her boyfriend. Detective Buben further learned that Ms. Brown, Ms. McLaurin, and Defendant were all employed by the same company in High Point. Detective Buben interviewed Ms. Brown. Ms. Brown told Detective Buben that she and Ms. Graves met Mr. Owens at the apartment complex to have a threesome. However, "two suspects approached and announced a robbery."

Detective Buben subsequently interviewed Defendant and Ms. McLaurin. Defendant stated he did not know about the death of Mr. Owens and appeared surprised that a homicide occurred in his neighborhood. Defendant informed Detective Buben that on the night of Mr. Owens's death, he was at home smoking marijuana with Ms. Graves and Ms. Brown. Defendant added, eventually, Ms. Graves and Ms. Brown left, and he did not see them again that night.

Detective Buben received the data extracted from Ms. Brown's phone. He found a text message Ms. Brown had sent to Defendant two days before Mr. Owens's death. It stated, "Who's a good person you know to set up that got bands?" From Detective Buben's experience, "a setup would be a robbery, and bands would be a thousand dollars."

Detective Buben continued his investigation and focused on the HiPoint nine-millimeter gun recovered from the crime scene. He suspected the gun may contain

traceable DNA. He also found a report from 2016 when Defendant sustained a gunshot wound and sought medical treatment at a nearby hospital. In that instance, while Defendant was at the hospital, Officer Presnell, also of the High Point Police Department, "[w]ent to the hospital for a shots-fired call" to investigate the incident. During his interview of Defendant, Officer Presnell noticed blood on Defendant's shirt and directed a crime scene technician to collect Defendant's shirt as evidence. That crime was never solved, and the shirt remained sealed, in an evidence locker.

Detective Buben retrieved Defendant's shirt from the 2016 incident and sent it to the State Crime Lab for DNA analysis. He also sent DNA swabs taken from the gun found at the scene for comparison. Detective Buben received the results which "found [Defendant's] DNA on almost every sample that we sent them." Based on his investigation, Detective Buben obtained a warrant for the arrest of Defendant for first-degree murder.

Detective Buben again interviewed Defendant. During this interview, Defendant stated that Ms. Brown, Ms. Brown's boyfriend, and Ms. Graves were hanging out at his house. The group discussed "robbing Mr. Owens." Defendant told them he did not want to participate but ultimately agreed to "hold the backpack out" as they robbed Mr. Owens. After Mr. Owens arrived at the apartment complex, Ms. Graves and Ms. Brown sat in Mr. Owens's vehicle and smoked marijuana. Ms. Brown's boyfriend then handed Defendant the gun and they approached the car. When they reached Mr. Owens's vehicle, "shots started ringing out" and Defendant

fired two shots in return, with one hitting the door of Mr. Owens's vehicle and the other going across the parking lot. Defendant fled from the scene and threw the gun in the woods.

On 12 July 2021, the Guildford County Grand Jury returned a true bill of indictment for Defendant for first-degree murder. Before trial, Defendant moved to suppress the DNA sample collected from the shirt he was wearing while receiving medical treatment in 2016. Defendant argued this evidence was the product of an illegal search and seizure, in violation of his rights under the state and federal constitutions.

The trial court held a hearing on Defendant's motion on 4 December 2023. At the hearing, Officer Presnell, the officer who spoke with Defendant at the hospital in 2016, testified he noticed blood on Defendant's clothing and requested that his clothes be collected for evidence. He stated that the shirt had evidentiary value because another individual's DNA could be found on the shirt.

Ms. Wilde, the forensic manager with the High Point Police Department, testified it is "standard" to collect items like Defendant's shirt, and they would not allow someone to retain such items because "[t]hey may have evidence for the case, and we're going to collect it for analysis." She added, "there's a lot of evidence we can glean from that shirt."

Lieutenant Blackman of the High Point Police Department was assigned to the 2016 case involving Defendant. He testified, "any biological evidence on the shirt is

evidence" and the shirt itself is evidence that "an assault took place." He noted that the case remained unsolved and the evidence would not have been released for this very reason. Additionally, despite attempts to contact Defendant after the incident, Lieutenant Blackman was unable to procced with the investigation because of Defendant's failure to respond as of "April 2018."

After hearing this evidence, the trial court denied Defendant's motion to suppress, made oral findings of fact, and concluded:

> One, the defendant had reported -- or had gone to the hospital to receive medical attention for a gunshot wound to his head.
>
> Two, either the defendant or the hospital -- it is unclear which -- called the Highpoint Police Department to indicate that, in addition to the defendant, there was another victim of a gunshot wound.
>
> Next, the High Point Police Department responded, as they were required to do, to a report of not only violence, but that two individuals were harmed as a result of a firearm incident.
>
> Four, when officers arrived, they attempted to speak to both of the individuals who were injured as a result of gunshot fire.
>
> Next, Officer Presnell testified that he talked to the defendant. He said he could visibly see the injury on the defendant as well as blood seemingly from the defendant's injury on his clothes. As a result of that plain view scene of evidence of a violent crime that was committed, Officer Presnell requested that one of the CSI lab personnel report to the hospital to collect that evidence.
>
> One of the CSI personnel from the High Point Police Department came to the hospital, photographed both

victims of the gunshot violence as well as taking clothes. The clothes, the blood could be visibly seen without any assistance from the defendant's pants, shoes, and both shirts he had on.

CSI Wilde indicated that the initial reports of incidents are not the controlling facts in whether evidence is seized because time may change people's memories or perceptions or willingness to cooperate, so all evidence has to be seized at that time.

Next, that all the officers testified that it is not only standard practice, but they could think of no particular case when bloody clothes in connection to a violent crime are not seized as part of the collections process. This indicates that the defendant's situation was not unique or that he was singled out or specifically targeted. It was just part of the standard practice of collecting evidence as part of an investigation into a violent crime.

Detective Blackman -- next, Detective Blackman indicated that he had conducted numerous follow-ups, including attempts to get the defendant to cooperate, but after eighteen months was unable to proceed further with the investigation.

Both CSI Wilde and Detective Blackman indicated in their testimony that that does not mean that the case is permanently closed, that other evidence or things may come along years later that will require the testing or use of the evidence to establish who may have perpetrated the violent crime that injured both the defendant and the person he came to the hospital with.

Based on the foregoing findings of facts, I would find that the clothes were in plain view of the initial responding officer, Officer Presnell, and Officer Presnell, without any further steps or investigation on his part, could in plain view see evidence of the defendant's apparent wounds on his clothes, that those wounds as well as that of the other person who came to the hospital with the defendant were alleged to have been caused by being shot by other

individuals. And at the time of that report, it was an ongoing investigation into a violent crime.

Next, I will find that it's a standard of practice and procedure to take items of evidence that are found in plain view, collect them, and store them as part of the investigative process; that that process may take days, weeks, or even years, but that evidence needs to be acquired at that time so it cannot be altered, changed, or lost.

Therefore, I will conclude that the items of clothing taken from the defendant on December 15th of 2016 were lawfully seized and taken as part of a reasonable practice and procedure in investigating a violent crime that the defendant indicated was perpetrated on him and that pursuant to State versus Barkley, 144 N.C. App. (2001), the defendant can no longer assert privacy claims or unreasonable searches on items that have been lawfully seized, including any samples of blood.

Based on that, I will respectfully deny the defendant's motion. I will note the defendant's exception to both my rulings in both my motions for the record.

Thereafter, Defendant's case proceeded to trial, and the jury found him guilty of first-degree murder. The trial court sentenced Defendant to life imprisonment without parole. Defendant entered his notice of appeal in open court.

## II.    Analysis

Defendant argues the trial court committed error by denying his motion to suppress. He claims the initial seizure of his clothing at the hospital was unlawful. Alternatively, he argues that even if the seizure was lawful, the analysis of his DNA was an unlawful search because he had a reasonable expectation of privacy over his genetic material located on the shirt.

## A.   Seizure of the Shirt under the Plain View Doctrine

Defendant first argues the trial court erred in denying his motion to suppress, alleging "[t]he trial court's findings do not support its conclusions of law because the conclusions of law were legally erroneous."  He posits that the bloody shirt "did not possess immediately apparent evidentiary value, as is required under the plain view doctrine," and "the trial court's findings were insufficient to support a conclusion that officers had a legal right to be present during [his] medical treatment."  Defendant thus maintains, "under no theory of Fourth Amendment jurisprudence was the government entitled to conduct a warrantless search of [his] DNA."

"The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Biber*, 365 N.C. 162, 167–68, 712 S.E.2d 874, 878 (2011) (citation omitted).  "[T]he trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *State v. Womble*, 277 N.C. App. 164, 173–74, 858 S.E.2d 304, 312 (2021) (citation omitted).  "Unchallenged findings of fact are deemed to be supported by competent evidence and are binding on appeal. Conclusions of law are reviewed de novo and are subject to full review." *State v. Stanley*, 259 N.C. App. 708, 711, 817 S.E.2d 107, 110 (2018) (citation omitted).

"The trial court's ruling on a motion to suppress is afforded great deference upon appellate review as it has the duty to hear testimony and weigh the evidence."

*State v. Wiles*, 270 N.C. App. 592, 595, 841 S.E.2d 321, 325 (2020) (citation omitted). The trial court may make oral findings and conclusions of law when ruling on a defendant's motion to suppress. *See State v. Oates*, 366 N.C. 264, 268, 732 S.E.2d 571, 574 (2012) ("While written determination is the best practice, nevertheless [N.C. Gen. Stat. § 15A-977(f) (2025)] does not require that these findings and conclusions be in writing.").

The state and federal constitutions provide freedom from unreasonable searches and seizures. U.S. Const. amend. IV; N.C. Const., art. 1 §§ 19, 20. "The object of the Fourth Amendment is to protect reasonable expectations of privacy." *State v. Wynn*, 45 N.C. App. 267, 270, 262 S.E.2d 689, 692 (1980) (citation omitted). Generally, to fall under the Fourth Amendment's protections, an "individual relying on immunity from unreasonable searches and seizures [must] have a 'reasonable expectation of freedom from governmental intrusion' in the place or property searched." *State v. Ysut Mlo*, 335 N.C. 353, 378, 440 S.E.2d 98, 110 (1994) (citations omitted). A warrantless search is unreasonable where an individual has " 'manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.' " *Kyllo v. United States*, 533 U.S. 27, 33, 121 S. Ct. 2038, 2042–43 (2001) (citing *California v. Ciraolo*, 476 U.S. 207, 211, 106 S. Ct. 1809, 1811 (1986)).

Generally, warrantless seizures are unconstitutional, but a permissible exception to the warrant requirement is the seizure of items under the plain view

doctrine. *State v. Grice*, 367 N.C. 753, 756, 767 S.E.2d 312, 316 (2015). To comply with this exception, the State carries the burden to establish: "First, 'that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed'; second, that the evidence's 'incriminating character . . . [was] immediately apparent'; and third, that the officer had 'a lawful right of access to the object itself.'" *Id.* at 756–57, 767 S.E.2d at 316 (quoting *Horton v. California*, 496 U.S. 128, 136–37, 110 S. Ct. 2301, 2308 (1990)). Our state appellate courts have similarly noted, the police may seize contraband or evidence under the plain view doctrine if the State establishes: "(1) the officer was in a place where he had a right to be when the evidence was discovered; (2) the evidence was discovered inadvertently;[1] and (3) it was immediately apparent to the police that the items observed were evidence of a crime or contraband." *State v. Graves*, 135 N.C. App. 216, 219, 519 S.E.2d 770, 772 (1999); *see also State v. Mickey*, 347 N.C. 508, 516, 495 S.E.2d 669, 674 (1998) (citations omitted) (explaining, "a seizure is lawful under the plain view exception when the officer was in a place where he had a right to be when the evidence was discovered and when it is immediately apparent to the police that the items observed constitute evidence of a crime," and "[t]he North Carolina General Assembly has imposed an additional requirement, not mandated by the Constitution of the United States, that the evidence discovered in plain view must be discovered

---

[1] Defendant does not argue this requirement.

inadvertently.").

### 1.    *Immediately Apparent Evidentiary Value*

We first consider Defendant's contention that "it was not immediately apparent to police that [his] clothing was evidence of a crime."

"Our courts have defined the term immediately apparent as being satisfied where the police have probable cause to believe that what they have come upon is evidence of criminal conduct." *State v. Hunter*, 286 N.C. App. 114, 117, 878 S.E.2d 676, 679 (2022) (quoting *State v. Green*, 146 N.C. App. 702, 706, 554 S.E.2d 834, 836 (2001)); *see also Graves*, 135 N.C. App. at 219, 519 S.E.2d at 772. And "in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In so doing, consideration of police purposes will be required." *State v. Howard*, 274 N.C. 186, 201–02, 162 S.E.2d 495, 505 (1968) (quoting *Maryland Penitentiary v. Hayden*, 387 U.S. 294, 306–07, 87 S. Ct. 1642, 1650 (1967)).

A review of the record highlights the feebleness of this particular argument by Defendant. Here, Officer Presnell went to the hospital for "a shots-fired call" to "get [Defendant's] story of what happened that day." And so, the trial court found, "the High Point Police Department responded, as they were required to do, to a report of not only violence, but that two individuals were harmed as a result of a firearm incident." Officer Presnell saw that Defendant "had a gunshot wound to the head" and "bloodstain was on his clothes." Accordingly, the trial court found Officer

Presnell "could visibly see the injury on the defendant as well as blood seemingly from the defendant's injury on his clothes." As Officer Presnell noted, "the evidentiary value that could come off the clothes is . . . it could have DNA from somebody else if they were struggling," "somebody else's blood," or "powder . . . something from the gun itself could match up later on down the road." Moreover, Ms. Wilde, the forensic manager, testified that Defendant's clothing may contain "gunshot residue," "hairs and fibers." The trial court thus found, "it is not only standard practice, but [the witnesses] could think of no particular case when bloody clothes in connection to a violent crime are not seized as part of the collections process."

These findings show Officer Presnell had probable cause to believe the bloody shirt was evidence of criminal conduct. *See Hunter*, 286 N.C. App. at 117, 878 S.E.2d at 679. The trial court's findings therefore support its conclusions that Officer Presnell "could in plain view see evidence of the defendant's apparent wounds on his clothes, that those wounds as well as that of the other person who came to the hospital with the defendant were alleged to have been caused by being shot by other individuals," and "the items of clothing taken from the defendant . . . were lawfully seized and taken as part of a reasonable practice and procedure in investigating a violent crime that the defendant indicated was perpetrated on him." *See State v. Ashworth*, 248 N.C. App. 649, 658, 790 S.E.2d 173, 179–80 (2016). We therefore dismiss, as meritless, Defendant's argument that the evidentiary value of the clothing was not immediately apparent.

### 2. *Legal Right to be Present*

We next consider Defendant's challenge that "[t]he trial court's findings were insufficient to support a conclusion that officers had a legal right to be present during [his] treatment."

First, we note that Defendant cites *State v. Nance*, 149 N.C. App. 734, 562 S.E.2d 557 (2002) for the general proposition that "[i]f the seized item is not located in a public place, officers may still have a lawful right of access to the item to justify its seizure if they entered the private property by consent, pursuant to a warrant, or under exigent circumstances." But that case contains highly distinguishable facts and analysis. The officers in *Nance* entered the defendant's private property, removed fencing, and seized horses absent a warrant or exigent circumstances. *Id.* at 742–44, 562 S.E.2d at 563–64. However, interestingly, the *Nance* Court restated the proposition that "law enforcement officers have the right to approach a person's residence to inquire as to whether the person is willing to answer questions, and do not trespass when they enter an individual's property for the purpose of a general inquiry or interview." *Id.* at 742, 562 S.E.2d at 563 (cleaned up).

Finding of Fact No. 3 provides that the High Point Police Department officers responded, "as they were required to do, to a report of not only violence, but that two individuals were harmed as a result of a firearm incident." Finding of Fact No. 4 reinforces the officers' purpose in being at the hospital—to investigate a report of violent crime. It provides the officers attempted to speak with both victims "who were

- 15 -

injured as a result of gunshot fire." These findings support the determination that Officer Presnell was in a place where he had a right to be when the evidence was discovered. *See, e.g., Graves*, 135 N.C. App. at 219, 519 S.E.2d at 772 ("In this case, the first prong of this plain view test is clearly met, as Officer Davis was rightfully in the emergency room trying to gather evidence concerning the shooting of defendant."). Defendant's argument as to this issue is likewise overruled.

### B. DNA Analysis

Next, Defendant argues that even if the initial seizure of his shirt was lawful, the subsequent warrantless search of his DNA was unlawful under the Fourth Amendment because he had a reasonable expectation of privacy "over his genetic material." Defendant specifically maintains that the plain view doctrine cannot serve as a basis for a warrantless search of his clothing because he "did not knowingly expose his DNA to the public."

This Court has previously addressed the testing of genetic material that was warrantlessly, but lawfully seized, in *State v. Barkley*, 144 N.C. App. 514, 518, 551 S.E.2d 131, 134 (2001), *appeal dismissed for lack of substantial constitutional question*, 354 N.C. 221, 554 S.E.2d 646 (2001). In that case, the defendant voluntarily consented to a blood draw while at the hospital, intending to exonerate himself in connection with a murder investigation. *Barkley*, 114 N.C. App. at 518, 551 S.E.2d at 134. Law enforcement later used DNA analysis from that blood sample to connect him to an unrelated crime. *Id.* On appeal, the defendant argued that this secondary

use of his blood sample violated his constitutional rights under the Fourth Amendment. *Id.*

In *Barkley*, this Court acknowledged "that the taking of blood from a person constitutes a search under both constitutions." *Id.* However, "once a person's blood sample has been obtained lawfully, he can no longer assert either privacy claims or unreasonable search and seizure arguments with respect to the use of that sample." *Id.* at 519, 551 S.E.2d at 135 (citation omitted). This is so because "[p]rivacy concerns are no longer relevant once the sample has already lawfully been removed from the body, and the scientific analysis of a sample does not involve any further search and seizure of a defendant's person." *Id.* (citation omitted). This Court noted, "[a]lthough human blood, with its unique genetic properties, may initially be quantitatively different from [ ] evidence [such as a gun or controlled substance], once constitutional concerns have been satisfied, a blood sample is not unlike other tangible property which can be subject to a battery of scientific tests." *Id.* Applying this principle, this Court determined the use of the DNA analysis of the defendant's blood "required no additional chemical analysis which might infringe any privacy interest he might have in the blood; rather, it involved only a comparison of the characteristics of his blood with the evidence in this case." *Id.* at 520, 551 S.E.2d at 135. Thus, this Court held that the defendant "suffered no additional intrusion," and the defendant's Fourth Amendment rights were not violated by the secondary use of his blood for the DNA analysis. *Id.*

Defendant proffers several arguments that seek to distinguish his case from *Barkley*. We find his arguments unpersuasive. Having determined that the clothing containing blood evidence was lawfully obtained by law enforcement under the plain view doctrine, the principle of *Barkley* remains applicable. Here, the sample was lawfully obtained, and the scientific analysis of that sample did not infringe on Defendant's state and federal constitutional right to be free from unreasonable searches and seizures. *See id.* at 519, 551 S.E.2d at 135; *see also* U.S. Const. amend. IV; N.C. Const., art. 1, §§ 19, 20. Defendant suffered no additional intrusion which might infringe any privacy interest he might have in the blood; instead, "it involved only a comparison of the characteristics of his blood with the evidence in this case." *Id.* at 520, 551 S.E.2d at 135. Defendant's arguments on this issue fail as his rights were not violated by the secondary use of his blood for the DNA analysis.

## C. Other Arguments

Defendant makes additional arguments about the doctrines of abandonment and inevitable discovery, but we need not consider them as our analysis does not rest on these exceptions to the exclusionary rule.

## III. Conclusion

For the reasons above, the trial court did not commit error by denying Defendant's suppression motion.


NO ERROR.

Judges STROUD and MURRY concur.